Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MANUEL VEGA JIMÉNEZ<br><br>Apelante<br><br>v.<br><br>PEP BOYS-MANNY, MOE & JACK OF PUERTO RICO, INC.; H/N/C PEP BOYS<br><br>Apelado | KLAN202200149 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: SJ2020CV05968<br><br>Sobre: Ley 80 Discrimen por Edad |
|---|---|---|

Panel especial integrado por su presidenta, la jueza Cintrón Cintrón, el juez Pagán Ocasio y la juez Aldebol Mora[1].

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 30 de junio de 2023.

Comparece el Sr. Manuel Vega Jiménez (señor Vega Jiménez o el apelante), y solicita la revocación de la *Sentencia* emitida el 21 de febrero de 2022, por el Tribunal de Primera Instancia, Sala de Bayamón (TPI o foro primario), notificada el 22 de febrero de 2022. Mediante la referida *Sentencia*, el foro primario declaró Ha Lugar la *Solicitud de Sentencia Sumaria* presentada por Pep Boys- Manny, Moe & Jack of Puerto Rico, Inc. (Pep Boys o la parte apelada) y desestimó la Querella sobre despido injustificado y discrimen por edad, presentada por el señor Vega Jiménez en contra de Pep Boys, mediante el procedimiento sumario para reclamaciones laborales que provee la Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118 *et seq.*, (Ley Núm. 2).

Por los fundamentos que pasamos a exponer, confirmamos la Sentencia Sumaria apelada.

I

El 6 de noviembre de 2020, el señor Vega Jiménez presentó querella en contra de Pep Boys, por despido injustificado y discrimen por edad, al

---

[1] Mediante Orden Administrativa OATA-2023-001 de 9 de enero de 2023, se designó a la Hon. Waleska Aldebol Mora en sustitución de la Hon. Eileen Barresi Ramos.

Número Identificador

SEN2023 _____

amparo de la Ley Núm. 80, del 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185 *et seq.,* (Ley Núm. 80), y de la Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec.146 et seq., (Ley Núm. 100). El apelante, se acogió al procedimiento sumario para reclamaciones laborales que provee la Ley Núm. 2, *supra.* En esencia, el señor Vega Jiménez alegó que su despido obedeció a amonestaciones fabricadas por su patrono, Pep Boys, sin que se amonestara a empleados más jóvenes**.**

El 20 de noviembre de 2020, Pep Boys contestó la querella y negó las alegaciones del apelante sobre despido injustificado y discrimen por edad. En síntesis, Pep Boys sostuvo que el despido del señor Vega Jiménez estuvo fundamentado en un patrón de violaciones a las normas, políticas y procedimientos de la empresa, por lo que hubo justa causa para despedirlo. En lo referente a las alegaciones sobre discrimen por edad, Pep Boys afirmó que no discriminó en contra del señor Vega Jiménez y que este nunca se quejó ni presentó querella interna sobre discrimen por edad, así como tampoco utilizó el procedimiento establecido por la empresa para garantizar la ausencia de discrimen en el entorno laboral.

En cuanto al descubrimiento de prueba, mediante *Resolución* de 27 de mayo de 2021, notificada el 28 de mayo de ese año, el TPI dispuso varios asuntos referentes a un requerimiento de información y producción de documentos solicitado por el señor Vega Jiménez a Pep Boys.[2] En esencia, el foro primario dispuso que en cuanto al listado de potenciales testigos de Pep Boys, la controversia se tornó académica porque se produjo la información. En cuanto a la copia de los expedientes de personal de los *Commercial Sales Specialist* solicitados por el apelante en el descubrimiento de prueba, el TPI no autorizó su producción. Concluyó el foro primario, que el requerimiento era general y oneroso y que además, contenía información personal y confidencial de terceros que no autorizaron su divulgación. Destacó el TPI, que aunque el señor Vega

---

[2] Véase *Resolución* emitida el 27 de mayo de 2021, páginas127-130 del Apéndice de la Apelación.

Jiménez, por conducto de su abogado, tuvo la oportunidad de revisar ciertos expedientes y tomar notas, no puso en posición al tribunal de evaluar la pertinencia de la documentación solicitada y se limitó a requerir la totalidad de los expedientes, lo que aparentaba ser una expedición de pesca. En lo que respecta a la **prueba documental en custodia de Pep Boys sobre la información del sistema "Domos", "Handheld Sales by Area", "Reporte de Ventas", "Profit Loss Statements", "Budgets", "Comparativas"** de los últimos cinco (5) años de todas las tiendas de Pep Boys, **el foro primario accedió a la producción de documentos solicitados por el apelante,** pero la limitó a las tiendas de Levittown, Plaza del Sol y Carr.167. **Dispuso, además, <u>que aunque el caso es uno sumario, en el ejercicio de su discreción, autorizaba el descubrimiento de prueba adicional solicitado por el señor Vega Jiménez,</u> toda vez que la información solicitada surgió de la deposición tomada al representante de Pep Boys y concedió a la parte apelada un término de treinta (30) días para producir los documentos requeridos, según autorizados por el tribunal.** Finalmente, en la aludida Resolución el TPI dispuso que el apelante tenía treinta (30) días para tomarle una deposición al Sr. Moisés Flores, únicamente sobre los documentos producidos y con esos fines, el TPI extendió el descubrimiento de prueba hasta el 31 de agosto de 2021.

**El 31 de agosto de 2021, culminó el descubrimiento de prueba, que incluyó una deposición tomada al apelante el 29 de diciembre de 2020 y el 2 de febrero de 2021.**

El 29 de septiembre de 2021, Pep Boys presentó *Solicitud de Sentencia Sumaria* en la que solicitó la desestimación de la reclamación de despido injustificado y de discrimen por edad, presentada por el señor Vega Jiménez. Asimismo, Pep Boys estableció la existencia de hechos incontrovertidos y alegó ausencia de hechos materiales en controversia. **En apoyo a su solicitud de desestimación sumaria de la querella, Pep Boys anejó abundante prueba documental sobre los hechos**

**incontrovertidos alegados, que incluyó las evaluaciones y las amonestaciones realizadas al apelante por el patrono y la transcripción de la deposición tomada al señor Vega Jiménez.**

Mediante *Orden* de 30 de septiembre de 2021, el foro primario concedió al apelante treinta (30) días para expresarse en torno a la *Solicitud de Sentencia Sumaria* presentada por Pep Boys. El 26 de octubre de 2021, el señor Vega Jiménez solicitó una prórroga de 30 días para oponerse a la *Solicitud de Sentencia Sumaria* y mediante *Orden* de 27 de octubre de 2021, el foro primario le concedió hasta el 29 de noviembre de 2021 para fijar su posición en torno a esta.

El 29 de noviembre de 2021, el apelante solicitó una segunda prórroga al TPI para oponerse a la *Solicitud de Sentencia Sumaria*. El 1 de diciembre de 2021, el foro primario emitió Orden en la que concedió al apelante hasta el 13 de diciembre de 2021, para presentar su oposición a la *Solicitud de Sentencia Sumaria* presentada por Pep Boys y reseñaló la Conferencia con Antelación al Juicio pautada para el 31 de enero de 2022, para celebrarse el 29 de marzo de 2022.

El 13 de diciembre de 2021, el señor Vega Jiménez solicitó nuevamente una prórroga para expresarse en torno a la *Solicitud de Sentencia Sumaria* presentada por Pep Boys. En esta ocasión, el apelante adujo que necesitaba realizar un descubrimiento de prueba y obtener declaraciones juradas de testigos de refutación. Pep Boys se opuso y el **14 de diciembre de 2021, el foro primario emitió *Orden* en la que denegó la tercera solicitud de prórroga presentada por el señor Vega Jiménez**.

Así las cosas, el 29 de diciembre de 2021 el señor Vega Jiménez presentó *Moción de Reconsideración y/o Paralización,* a la que se opuso Pep Boys, el 30 de diciembre de 2021. El 11 de enero de 2022, el TPI emitió Orden en la que declaró No Ha Lugar la *Moción de Reconsideración y/o Paralización* presentada por el apelante.

Mediante Sentencia emitida el el 21 de febrero de 2022, notificada al día siguiente, el foro primario declaró Ha Lugar la *Solicitud de Sentencia Sumaria* presentada por Pep Boys; desestimó con perjuicio la Querella sobre despido injustificado y discrimen por edad, presentada por el señor Vega Jiménez en contra de Pep Boys y concluyó que el apelante no se opuso a la *Solicitud de Sentencia Sumaria* presentada por el patrono; que su despido fue justificado y que el señor Vega Jiménez no estableció ninguna razón discriminatoria. Dispuso además, que el señor Vega Jiménez no compareció dentro del término concedido, pese a las múltiples oportunidades que tuvo, por lo que dio por sometida la solicitud de sentencia sumaria de Pep Boys –sin oposición- y evaluada la misma, así como los documentos que la acompañan, concluyó que esta cumple con todos los criterios establecidos por la Regla 36.2 y 36.3 de Procedimiento Civil, *supra*.

En dicha Sentencia el foro primario, tras evaluar la *Solicitud de Sentencia Sumaria* presentada por Pep Boys conjuntamente con la prueba documental anejada, que incluyó la deposición tomada al apelante, concluyó que hay ausencia de controversia real y sustancial y determinó como incontrovertidos los siguientes hechos:

**II. DETERMINACIONES DE HECHO**

1. Pep Boys se dedica a la venta de piezas, gomas y accesorios de auto, así como servicio automotriz y opera varias tiendas en Puerto Rico.

2. El querellante trabajó para Pep Boys desde el 26 de agosto de 1996 hasta el 8 de noviembre de 2019, fecha en que fue despedido.

3. A la fecha de su despido, el querellante se desempeñaba en la posición de "Commercial Sales Manager" en la tienda de Pep Boys de Levittown.

4. Vega recibió copia de la Guía Operacional del Empleado de Pep Boys ("Guía" o "Manual de Empleado"), y conocía su contenido.

5. Dicho Manual de Empleado establece unas normas, políticas y procedimientos cuyas violaciones pueden conllevar acciones disciplinarias, incluyendo el despido.

6. Vega admitió que conocía bien las normas, políticas y procedimientos de Pep Boys.

7. Pep Boys tiene establecida una política que prohíbe el discrimen en el empleo, incluyendo el discrimen por edad.

8. Vega admitió que mantuvo en todo momento durante su empleo con Pep Boys relaciones cordiales y profesionales de trabajo con todos sus supervisores.

9. El querellante recibió y firmó copia de la descripción de deberes de la posición de "Commercial Sales Manager", la cual resume las funciones, deberes y responsabilidades de dicha posición.

10. Las funciones del querellante como "Commercial Sales Manager" se pueden resumir de la siguiente manera: (i) estar a cargo del grupo de empleados del área de Auto Parts Delivery o APD y; (ii) estar a cargo de las ventas y de la operación del departamento de APD. En dicha posición, Vega respondía al gerente de la tienda.

11. Como empleado gerencial a cargo del departamento de APD, Vega tenía que velar por la supervisión adecuada de los empleados; asegurarse que los empleados llevaran a cabo el trabajo adecuadamente; que el área de trabajo estuviera organizada; velar por el inventario así como el cumplimiento de las normas, políticas y procedimientos de la compañía; velar por que se diera un servicio de excelencia a los clientes; tener asistencia puntual y regular al trabajo; y aprobar las auditorías que se hacían en su departamento; o de lo contrario se exponía a acciones disciplinarias. En la posición de "Commercial Sales Manager" el querellante supervisaba aproximadamente cinco empleados, entre los cuales figuraban cuatro choferes y un empleado que ocupaba el puesto de telemercadeo.

12. Vega admitió que las ausencias al trabajo afectan la operación del patrono, crean contratiempos y gastos adicionales y sobrecargan la labor del personal que va a trabajar, afectando la moral de los empleados.

13. El Departamento de APD ha tenido distintos nombres durante el transcurso de los años, llegándose a llamar Pep Express.

14. Dicho departamento también se conoce como el área comercial de la tienda y se dedica a vender, distribuir y entregar piezas a clientes comerciales, incluyendo negocios de "auto parts".

15. Vega admitió que los pedidos de mercancía especial eran pedidos que se hacían para un cliente en particular donde había que llenar la información del cliente, incluyendo el nombre y su número de teléfono.

16. Vega admitió que cuando se hace el proceso de devolución de garantía se tiene que hacer el procedimiento de garantía ese mismo día.

17. Vega admitió que debía acceder a los informes de ventas todos los días.

18. Vega admitió que debía mostrar sentido de urgencia hacia su trabajo.

19. El querellante debía asegurarse que los empleados que supervisaba se comunicaran periódicamente con los clientes VIP para conocer cuáles eran las necesidades y promover las ventas.

20. Como "Commercial Sales Manager", Vega debía cumplir con las expectativas o métricas que dicha posición exigía.

21. El querellante, además, debía tratar con respeto y cortesía a los clientes y proveer un servicio de excelencia o, de lo contrario, podría conllevar acciones disciplinarias.

22. Vega admitió que Pep Boys es una compañía de servicio y las referencias que los clientes brindan a terceros son cruciales para la compañía.

23. Vega admitió que siempre estuvo conforme con los términos y condiciones de su relación de empleo con Pep Boys.

24. Durante su relación de empleo, el querellante fue evaluado por escrito. Dichas evaluaciones se discutían con el querellante y éste tenía la oportunidad de revisarlas y firmarlas si estaba de acuerdo.

25. Vega recibió una evaluación correspondiente al año 2007, la cual fue discutida con él, firmando copia de la misma el 13 de abril de 2008. El único comentario hecho por el querellante en la evaluación fue "[b]uscaremos clientes nuevos". El querellante obtuvo en dicha evaluación una puntuación total de 2.39 de 5 puntos[3].

26. Vega recibió una evaluación correspondiente al año 2009, la cual fue discutida con él, firmando copia de la misma el 20 de abril de 2010. El querellante no consignó comentario alguno en dicha evaluación. El querellante obtuvo en dicha evaluación una puntuación total de 2.78 de 5 puntos.

27. Vega recibió una evaluación correspondiente al año 2011, la cual fue discutida con él, firmando copia de la misma. El querellante no consignó comentario alguno en dicha evaluación. El querellante recibió en dicha evaluación una puntuación total de 2.7 de 5 puntos.

28. Vega recibió una evaluación correspondiente al año 2012, la cual fue discutida con él, firmando copia de la misma. El querellante no consignó comentario alguno en dicha evaluación. El querellante recibió en dicha evaluación una puntuación total de 2.94 de 5 puntos.

29. Vega recibió una evaluación correspondiente al año 2013, la cual fue discutida con él, firmando copia de la misma. El querellante no consignó comentario alguno en dicha evaluación. El querellante obtuvo en dicha evaluación una puntuación total de 2.88 de 5 puntos.

30. Durante su relación de empleo con Pep Boys el querellante fue objeto de acciones disciplinarias por parte de distintos supervisores.

31. Vega recibió un "Notice of Performance Counseling" del 14 de octubre de 2002, el cual fue discutido con él, y que éste firmó sin consignar comentario alguno.

32. El "Notice of Performance Counseling" del 14 de octubre de 2002 establece lo siguiente: "Debe organizarse para poder hacer su trabajo. En repetidas ocasiones hemos hablado de tener el trabajo al día o de completar las cosas que tiene que hacer diarias, semanales, y más importante todo lo que conlleva puntos en la auditoría. Hoy, 10/14/02, al entrar a trabajar a las 6:40 a.m., me encuentro con que los papeles del "Daily Cash Report" están en el "laser printer" sin su firma. En adición a esto, la reconciliación de la cajera 9420 no fue firmada por usted. Como si fuera poco, dejó el "Daily Store Safe and Deposit Report" sin el conteo del dinero al finalizar el día, no tenía uno de los números de sello de las bolsas plásticas de las cajeras, ni […] el número de sello de las bolsas principales del efectivo y cheques, ni tenía las cantidades en dinero, ni estaba firmado en las dos áreas."

33. En dicho "Notice of Performance Counseling" también se señala: "Por otro lado, te hablé de que cuando hubiera un empleado nuevo tenía que entrar cuando […] estuvieras. Esto te lo dije la semana pasada y ya hoy lunes hay un nuevo empleado de nombre Edward el cual entró a las 9 a.m. Necesito que preste más atención a su trabajo y […] sobre todo no se olvide de lo que hay que hacer a diario y semanal. Le exhorto a que escriba todo lo que necesite hacer en

---

[3] Destacamos que una puntuación de 2.0 en las evaluaciones preparadas por Pep Boys significa que la persona evaluada "requires improvement". Anejos V, VI, VII, VIII y IX de la Solicitud de Sentencia Sumaria de Pep Boys.

el día antes de comenzar. Siga instrucciones y todo lo que se le pida para hoy es para hoy y no para mañana".

34. El querellante recibió un "Notice of Performance Counseling" el 15 de noviembre de 2002 el cual está firmado por él. Vega admitió que dicho documento fue discutido con él. Éste no recuerda haber hecho objeción verbal alguna al mismo.

35. El documento consigna lo siguiente: "El día miércoles, 13 de noviembre de 2002, el Departamento de APD obtuvo un 70 por ciento en la auditoría realizada por la señora Carmen Medero. Como usted sabe, usted es el responsable y encargado de este departamento… Se le dio las herramientas para que revisara documentos, cuentas y vehículos, acción que no realizó y por consecuencia a esto se obtuvo tan baja puntuación. Le exhorto a seguir la política y procedimientos del Departamento de APD".

36. Vega recibió un "Notice of Performance Counseling" del 27 de marzo de 2003, el cual está firmado por él sin consignar comentario alguno en el documento. Vega admitió que dicho documento fue discutido con él y éste no recuerda si tuvo alguna objeción verbal en ese momento.

37. El documento recoge que: "El día 3/4/03 se recibió un vagón de baterías número 881020 y no hicieron los ajustes pertinentes de 'delivery adjustments' negativos de las baterías que no llegaron. Como es de su conocimiento este procedimiento hay que realizarlo dentro de las próximas 48 horas luego de haber recibido la mercancía y enviar un email a Teresa Barron y Bradley Collins. Luego, el 3/11/03 hacen una auditoría de la categoría 1349…, la cual reflejó una pérdida de 1,724 con 69 centavos y se adjudicó como pérdida a la tienda por no seguir el procedimiento correcto".

38. Finalmente, la amonestación escrita de 27 de marzo de 2003 señala que: "Como gerencial de esta compañía es su responsabilidad supervisar que los procedimientos se realicen, inclusive les dejé un listado de trabajo recordándole este procedimiento y no lo realizaron. Estas pérdidas son intolerables. Por lo tanto, no puede volver a ocurrir una situación similar. Usted como gerencial puede delegar, pero es su responsabilidad verificar que se realizó y no permitir que los procedimientos o tareas entienda que los hace las personas que delegó. En ocasiones próximas debe tener mayor cuidado, atención y responsabilidad en el manejo y control del inventario".

39. El querellante recibió una "Segunda Notificación Escrita" el 14 de agosto de 2003. Dicho documento fue discutido con el querellante. El querellante escribió en el mismo: "No estoy de acuerdo, lo objeto". No obstante, admitió que no recuerda por qué no estuvo de acuerdo.

40. En dicha "Segunda Notificación Escrita" se señala que: "Por este medio le notifico una serie de deficiencias que están sucediendo en el Departamento de Piezas que usted supervisa. Y en adición, encontradas en la visita del señor Irving Vázquez, director de área, el 23/07/03 e informadas por mi persona a usted… Cuando usted comience una tarea tiene que asegurarse de completarla y no dejara sin terminar y la misma en un periodo razonable. No puede comenzar a realizar otras tareas sin finalizar las que comenzó, ya que nunca se completarán y el resultado no se va a obtener. Los planogramas tienen que estar al día. El programa de devolución de "cores" y "defectives" se realice a un cien por ciento. El programa "Rotating Electrical", baterías defectuosas y "cores" se realicen correctamente y estén organizadas. Los cambios de precios actualizados, toda la mercancía con precios, tomar los ceros semanalmente, "facing" diario, almacén organizado y recogido, limpieza y organizar diariamente el "counter" de piezas. Pep Express y "pick list", trabajar el "overstock" semanalmente, las góndolas limpias y organizadas, etcétera".

41. La "Segunda Notificación Escrita" establece, además, lo siguiente:

"Recuerde que usted es el supervisor del Departamento de Piezas, "Pick List" y Pep Express y por lo tanto tiene que supervisar, delegar y trabajar en todos esos departamentos y no solamente en el área de Pep Express. Usted tiene que lograr que su personal asuma responsabilidades de acuerdo a su posición y hacerlos responsables de los resultados. Espero su cooperación… y que tome medidas correctivas inmediatas para corregir las deficiencias y que no se repitan. De lo contrario, se tomarán medidas disciplinarias… Recuerde que la tienda tiene que operar en todo momento bajo los estándares y políticas de la compañía".

42. Vega recibió un "Notice of Performance Counseling" el 16 de marzo de 2005, el cual firmó sin hacer comentario alguno en el mismo.

43. Este documento indica lo siguiente: "En esta pasada semana se estuvo haciendo una inspección al Departamento de Piezas, departamento que usted tiene a su cargo. Lamentablemente su departamento no presenta el estándar que demanda la compañía, y con cosas tan fundamentales que se le han mencionado en varias ocasiones.

No vamos a tolerar ni dejar pasar por alto más que este departamento esté en estas condiciones tan críticas. Es evidente que usted no está dando seguimiento de sus deberes como "commercial manager" y sobre todo la falta de supervisión a sus subordinados y la falta de delegar y hacer un plan de trabajo eficiente. Esperamos que de ahora en adelante usted mantenga, siga poniendo el "auto part" como tiene que estar siempre, ya que nos dimos a la tarea de ponerlo al día y sí se puede sin excusas, delegando, supervisando y haciendo un plan de trabajo eficiente siempre".

44. Vega recibió un "Notice of Performance Counseling" del 19 de noviembre de 2005 el cual constituyó "un repeated counseling". Esta nueva amonestación fue discutida con Vega, y éste la firmó sin hacer comentario alguno.

45. El documento indica lo siguiente: "En esta semana se estuvo haciendo una inspección al Departamento de Piezas nuevamente y se [encontró]…[que] el inventario no está al día, [y que] las auditorías mandatorias no se están haciendo. Permítanos recordarle que dentro de sus responsabilidades como supervisor de dicho departamento están todas las antes mencionadas [responsabilidades] y en adición la de supervisar al personal, cosa lo (sic) usted ha hecho poco […] o ninguno (sic) y esto lo hemos discutido con usted. No vamos a dejar de pasar por alto más ni tolerar estas deficiencias de su parte, ya que no está a la altura de los estándares que la compañía demanda para la plaza que ocupa. De seguir con este patrón usted, nos veríamos forzados a removerlo de su posición, ya que al momento no está rindiendo con (sic) las expectativas que requiere su posición y también con la supervisión de su personal".

46. Vega recibió un "Notice of Performance Counseling" del 5 de octubre de 2007. El querellante admitió que dicho documento se discutió con él, y que lo firmó sin hacer comentario alguno en el mismo.

47. En dicho "Notice of Performance Counseling" se explica lo siguiente:

"En el día 10/4/07 la tienda de Levittown 913 fue auditada […]. En tal auditoría fue notable la falta de supervisión de su parte debido a que vimos reportes "log" de salida y entrada[4], "core return" sin firmar[5] y

---

[4] Estos logs se refieren a los registros de entradas y salidas del vehículo de "delivery" del Departamento de APD.
[5] Los "core" son piezas que se devuelven al manufacturero y se recibe dinero por dicha devolución. El querellante admite que mantener los documentos del departamento que

varios papeles de su trabajo regular. Es de su conocimiento que usted debe estar al pendiente de toda salida o suceso de su departamento. Por no haber supervisado esas funciones la auditoría se vio afectada debido a que son procedimientos de rutina y usted no los cumplió, lo cual provocó que su departamento no pasara auditoría. Por consecuencia, también afecta las demás que conlleva la auditoría. Se le recomienda que esté más al pendiente de sus funciones y de todo reporte de su departamento. De no mejorar tal acción, nos veremos obligados a tomar medidas más drásticas, las cuales pueden conllevar a prescindir de sus servicios [,] que se le dio advertencia específica de que si no mejoraba su desempeño iba a enfrentar otras medidas disciplinarias más drásticas y que entendió dicha advertencia".

48. El querellante recibió otro "Notice of Performance Counseling" el 2 de septiembre de 2008. Vega admitió que dicho documento fue discutido con él y éste lo firmó sin hacer comentario alguno en el mismo.

49. La amonestación impartida por Pep Boys a Vega el 2 de septiembre de 2008 fue por no responder a llamada de "mystery shopper" realizada a su departamento. Vega admitió que como gerente comercial tiene que ser el ejemplo para los demás empleados y que siendo Pep Boys una compañía de servicios es crucial que se contesten de manera adecuada y con prontitud las llamadas[6].

50. El querellante recibió un "Notice of Performance Counseling" del 30 de abril de 2008, en el cual no consignó comentario alguno. Además, el querellante admitió que al firmar dicho documento admitió estar de acuerdo con el contenido del mismo. En el documento se le explicó a Vega que procesó una devolución "defective" de un alternador, dejando el mismo sin el "tag" de "defective" y sin la prueba del mismo en el counter del departamento de APD. En el documento, se le exhortó al querellante a seguir los procedimientos de la compañía ya que este tipo de acción creaba una pérdida en el inventario de la tienda.

51. Vega recibió un "Notice of Performance Counseling" del 29 de mayo de 2013. El querellante admitió que dicho documento fue discutido con él, y éste lo firmó sin realizar comentario alguno en el mismo. El querellante admite que cuando firmó dicho documento reconoció que había cometido las faltas y los señalamientos allí indicados. La amonestación escrita recoge lo siguiente: "Se le requiere tomar acción de inmediato. Usted debe: Al preparar un "stock transfer request" de inmediato busque la firma un gerente. Colocar en bandeja pendiente. Al llegar la mercancía usted debe buscar el "request" …Colocar ambos en carpeta. De usted no tomar acción al respecto tendremos que tomar otras medidas disciplinarias con usted, que podrían incluir su despido".

52. El 28 de noviembre de 2016, el querellante recibió una nueva Consejería Escrita. Vega admitió que el documento fue discutido con él, y éste la firmó. En dicho documento se le amonestó de la siguiente manera: "La deficiencia encontrada, la cual da pie a esta amonestación, se debe a que el asociado Manuel Vega ha tenido 16 ausencias durante el periodo que comprende el año 2016. Y, aunque en efecto han sido debidamente excusadas, han afectado la operación del Departamento Comercial del cual es él el responsable. Se requiere de parte del asociado Manuel Vega corregir de inmediato dicha conducta relacionada a las ausencias. El continuar con dicha conducta podría conllevar medidas disciplinarias que podrían

---

supervisaba organizados y con su firma era una función importante que él tenía como parte de las funciones de su puesto.

[6] Estas llamadas son un programa de la compañía donde se llama a la tienda para verificar que el departamento esté contestando de manera adecuada y con prontitud las llamadas que hacen los clientes. Si no se cumple con ese programa, se hacen unos señalamientos a la tienda en las auditorías.

conllevar desde una amonestación escrita hasta la terminación del empleo, según sea la situación."

53. Vega recibió una amonestación escrita el 24 de enero de 2017, la cual firmó sin consignar ningún comentario. En el documento se señala que se discutió con el querellante los siguientes temas y que se le requirió que tomara acción de inmediato para corregir los mismos: Horario, prioridad de ventas, baterías, "counter standard", consistencia en las tareas asignadas, seguimiento a los programas de venta.

54. El 16 de septiembre de 2017, el querellante recibió una "Consejería Escrita" la cual fue discutida con él. Vega no firmó el documento y se consignó el siguiente comentario: "Asociado quedó en que el próximo lunes lo resolverá, según acordado con el señor López". Dicho documento señala: "La deficiencia encontrada, la cual da pie a esta amonestación escrita, se debe a que usted, Manuel Vega, se le entregaron los documentos para registrar el marbete a (sic) Obras Públicas durante la última semana de agosto, o sea, hace tres semanas. Al día de hoy, esto no se ha cumplido y como resultado tenemos un vehículo que no puede ser utilizado. Varias veces le he recordado que tiene que ir a Obras Públicas para hacer las gestiones y su respuesta ha sido que no tiene tiempo. Le recordamos que parte de sus responsabilidades como especialista comercial es estar pendiente a que nuestros vehículos tengas sus documentos y mantenimientos al día. Se requiere de parte del asociado Manuel Vega corregir de inmediato dicha conducta relacionado a sus responsabilidades. El volver a incurrir en dicha conducta podría conllevar medidas disciplinarias que podrían conllevar desde una amonestación hasta la terminación del empleo de forma inmediata." Vega reconoció que él era quién estaba a cargo de dicho departamento, y era la persona que tenía que dar seguimiento a dicha situación.

55. El 9 de marzo de 2018, el querellante recibió un "Formulario de Acción Disciplinaria". El documento fue discutido con Vega, y contiene un comentario que establece lo siguiente: "[El empleado] no quiso comentar ni firmar." Vega admitió en su deposición que pudo haber escrito comentarios en el documento pero no lo hizo. El documento explica lo siguiente: "El 5 de marzo usted tramitó un cambio en garantía al cliente Freddy Auto, "electric P/S pump" 50-6236, en boleto manual de devolución número 636252 y no hizo el procedimiento de garantía hasta el día 23 de marzo. Esta falta a la regla y procedimiento que exige la compañía, de que este proceso se debe hacer el mismo día que se hace el cambio del producto, ya que esto afecta el inventario de la tienda y la cuenta del cliente. Como usted sabe, llevamos varios meses trabajando con usted referente a los procesos de su área de trabajo y le hemos señalado varias veces la importancia de llevar estos al pie de la letra… no se aceptará otro fallo."

56. El 10 de marzo de 2018, el querellante recibió un "Formulario de Acción Disciplinaria". Vega admitió que dicho documento fue discutido con él y que no quiso firmarlo. En dicho documento aparece consignado "No quiso comentar y firmar." El documento señala lo siguiente: "Hoy, 9 de abril del 2018, al verificar las ventas hasta el día de hoy, su área está 12 mil negativo versus 2017. Al preguntársele a usted cómo podemos recuperar estas ventas, no recibimos contestación. Quiero recordarle es de su total responsabilidad ver que su parte del negocio logre las mínimas expectativas de la compañía, que esa es la razón de su posición. En nuestro distrito su área es la más atrasada en venta, que está, de solo cuatro tiendas negativas en todo el distrito. Hemos hablado de esto con usted en múltiples ocasiones, hemos visitado clientes, le hemos dado sugerencias, y le apoyamos dejando que use todas las horas necesarias. Le señalamos de usar los procedimientos de entregas, estrategias de ventas. Le compramos dos teléfonos celulares para

resolver la problemática de la falta de líneas telefónicas regulares. Pero ni los procedimientos ni las ventas se están logrando. Le invitamos a que corrija esta situación."

57. El 19 de junio de 2019, el querellante recibió una nueva "Consejería por Desempeño". Vega firmó el documento sin hacer ningún comentario en el mismo. La nueva amonestación señala: "En el día de ayer, trabajando los "special orders" y "store transfers", en específico me encuentro con varias piezas ordenadas por usted y que fueron pedidas a diferentes tiendas, o sea, las está pidiendo sin tener un cliente esperando o las pidió para ver cuál llegaba primero. Ya esta situación se había discutido con usted e incluso se había hecho por escrito. Se aclara con usted que ya se había hablado del asunto y se le prohibió que esta situación de ordenar piezas sin estar vendidas o a diferentes tiendas, duplicando la orden, nos está afectando el inventario y en la mayoría de los casos creando un "overstock". Por lo tanto, nos crea más trabajo para nuestro equipo de trabajo. Esta es la segunda corrección por escrito que este servidor le discute. Por lo tanto, de usted no corregir de inmediato se considera como una insubordinación por no seguir órdenes específicas y se tomarán las medidas correspondientes."

58. El 17 de julio de 2019, el querellante recibió otra "Consejería por Desempeño". Vega firmó dicho documento sin consignar ningún comentario en el mismo. En el documento se explica lo siguiente: "En el día de ayer vino a su tienda Valdez de Mecánica Valdez a pagar unas facturas pendientes [;] al indicarle sus facturas descubiertas encontró que varias de ellas tenían objeción [;] una de ellas había sido una pieza errónea la cual al buscar en el archivo se encontró archivada con una nota que decía (VOID no era ese carro) pero la factura aparecía pendiente en el sistema factura ## 09131121441 por 39.01. Ese mismo día se le hizo otra factura que se cobró como el (sic) indica. Buscando las facturas en el file nos encontramos los tickets del día 11 de julio sin a tachar (sic) a las facturas y con un pago de Sabana Seca tire todo a (sic) grapado sin procesar como se pidió que se hiciera. El proceso de archivo de facturas es importante para mantener el control de los procesos de la compañía y a la misma vez mantener las cuentas claras con nuestros clientes."

59. En dicho documento se le señala además lo siguiente: "Se requiere de usted y su equipo de trabajo[7] se procese y se mantenga la documentación y los controles según establecido (sic), no podemos seguir aceptando que el trabajo no se haga según las directrices requeridas. Tanto facturas como pagos a cuentas, como cores y defectives tienen un proceso el cual es su responsabilidad de que se cumplan. No se aceptará que estos procesos no se lleven a cabo según las directrices".

60. El 19 de agosto de 2019, el querellante recibió una "Consejería por Desempeño" en la cual se consignó el siguiente comentario: "Rehusó firmar el documento". Vega admitió que dicho documento fue discutido con él y que no escribió ningún comentario. En dicho documento se explica que: "En el día 08/07/2019 tuvimos la visita de nuestro RVP[8], señor Moisés Flores, y el señor Ernesto Feliciano, director de área. En esta visita inspeccionaron varias áreas de nuestra tienda donde ellos confirmarían cómo se estaban implementando los procesos y maximizando las nuevas herramientas de trabajo que la compañía nos ha dado para subir el servicio al cliente y las ventas. Uno de esos procesos era actualizar nuestros clientes VIP[9]. Ellos pidieron el listado nuevo que se había trabajado el día 08/03/0219, a lo que usted le entregó una lista y ellos le cuestionaron si usted sabía cuáles cambios se habían hecho y

---

[7] Vega admitió que la persona que según él traspapeló la factura trabaja en su departamento bajo su responsabilidad.
[8] RVP es "Retail Vice President".
[9] Así cataloga Pep Boys a sus clientes importantes.

cuáles habían salido de la lista anterior y las razones por las cuales se habían hecho los cambios. A lo que usted contestó que no sabía o no se acordaba… Usted demostró no estar involucrado o comprometido con los programas y procesos que la compañía nos está dando para lograr nuestras metas. Le recomendamos… que usted sea responsable de que los procesos y los programas se den para salir adelante… y se cumplan al cien por ciento. No se aceptará menos de usted." Vega admitió que existía una instrucción que requiere darle prioridad a los clientes VIP y que la idea detrás de la misma era incrementar las ventas.

61. Vega admitió que ese día recibió la visita de Moisés Flores y Ernesto Feliciano, dos "jefes grandes" de la compañía, a quiénes debía atender y quiénes tenían legítimo derecho de hacerle preguntas y él debía contestar las mismas. Finalmente, admitió que era su responsabilidad conocer los procedimientos de la compañía y acceder los informes.

62. El 29 de septiembre de 2019, el querellante recibió un "Formulario de Acción Disciplinaria", consejería final, sobre desempeño no satisfactorio el cual fue discutido con él pero éste no quiso firmarlo. El documento indica lo siguiente: "En el día viernes 09/27/2019, a las 5:00 p.m., le pregunté a usted por una lista de clientes VIP que le había entregado el martes anterior para que llamara o visitara varios clientes que estaban negativos en compras. Que necesitaban que me reportara lo que le comentara el cliente. Al yo preguntarle, usted no sabía ni dónde había puesto la lista. Y al encontrarla no había hecho lo que se le pidió que hiciera. Eso denota, primero, que no le importó la instrucción que yo le había dado; y, segundo, la no atención a sus responsabilidades. La razón y la importancia eran la que le había explicado el día que le dí la lista, porque estábamos 885 dólares por debajo en las últimas cuatro semanas solamente en los 10 clientes VIP que habíamos escogido para crecer el negocio con ellos. Además, al día de hoy, MTD, estamos negativo 21,759, asunto preocupante e inaceptable para la compañía. Lo más preocupante de esto es su actitud al momento de pedirle la información de indiferencia y donde llegó a hacer comentarios fuera de lugar frente a los asociados, como si no le importara si lo despedían. Esta actitud ha creado desmotivación y desánimo entre los asociados de su departamento. Usted constatemente ha estado incumpliendo no solo con las ventas de su área, sino con los procesos y procedimientos que ha establecido la compañía para el manejo saludable de su área de trabajo." Vega admitió que no tiene evidencia que refute que las ventas en su departamento estaban en negativo. El querellante admitió, además, que no había llenado la lista de los clientes VIP.

63. El querellante admitió que reconocía que una consejería final significaba que si volvía a incurrir en violaciones a las normas o no mejoraba su desempeño, iba a ser despedido.

64. El 11 de octubre de 2019, el querellante recibió un "Formulario de Acción Disciplinaria", Consejería Final. Vega admitió que el documento fue discutido con él y que no lo firmó ni escribió comentario alguno en el mismo. El documento examinado por este Tribunal señala: "En el día de hoy 10/11/2019 se ha estado viendo el asunto de las ventas o los resultados de las últimas semanas, en especial los resultados de la semana pasada, Súper Sábado, donde no se logró la meta esperada. Al día de hoy nuestra tienda en el área comercial está en negativo 30.5 por ciento "month to date", esto en el área de más enfoque de la compañía, que es la venta de piezas. Como hemos hablado con usted en oportunidades anteriores, no se está maximizando las oportunidades y muy preocupante nuestros clientes VIP siguen bajando sus compras semana tras semana. Nuestra compañía espera de nosotros sus líderes trabajar para el crecimiento de nuestro negocio y usar todas las herramientas de trabajo que se nos brindan… La mayoría de estos, usted no los ha desarrollado y eso ha sido la razón de su pobre desempeño. En el

pasado se ha discutido con usted, en: 10 de marzo de 2018, 17 de julio de 2019, 19 de agosto de 2019, 29 de septiembre de 2019."

65. En dicho documento se señaló, además, lo siguiente: "Hemos cubierto [todos] estos asuntos con usted y no vemos mejoría en las ventas de su departamento, que son su responsabilidad. No hemos visto cambio alguno ni interés de su parte en lograr las ventas y las metas que nos pide la compañía."

66. Vega admitió que no tiene evidencia que refute que para esa fecha el área comercial, que estaba bajo su responsabilidad, estaba en negativo 30.5 por ciento "month to date". Admitió, además, que ya se había dialogado con él en cuanto a que las ventas habían decaído, y que se había discutido con él la importancia de incentivar a los clientes VIP y de reenfocar las ventas.

67. El 8 de noviembre de 2019, Vega recibió un "Formulario de Acción Disciplinaria". Dicho documento señala lo siguiente: "El desempeño del señor Vega no es el esperado y necesario para la empresa. Al señor Vega se le ha dado asesoría y oportunidades para corregir su desempeño, las cuales no ha querido aprovechar. La actitud del señor Vega es de dejadez, desinterés y hacer caso omiso a la asesoría y advertencias de su supervisor. Las ventas del Departamento Comercial de la tienda 913 para el 2019 son: "Year-to-date", "Budget" menos 17.6 por ciento, Comparativa menos 4.8 por ciento; "Quarter-to-date", bajo "Budget" negativo 21.8 por ciento, y en Comparativas negativo 13.6 por ciento. En el 2018 los resultados fueron igualmente negativos, quedando la tienda en negativo 1 por ciento contra el "budget". Los resultados no solo son negativos, sino van en una tendencia de mal en peor. Como "commercial sales specialist", el señor Vega es responsable de mantener un desempeño adecuado, que cumpla con las expectativas de la empresa. En adición, es responsable de dar dirección a su equipo, hacer cumplir las políticas y procedimientos, cumplir con estas y dar el ejemplo".

68. El documento antes señalado expone además lo siguiente: "En una visita reciente del director de área, se encontró que el señor Vega estaba trabajando en su día libre, según el intinerario posteado. Al cuestionarle, primero indicó que él estaba en horario y al mostrarle el itinerario admitió haberse equivocado. El señor Vega cambió su día libre sin autorización o ni siquiera le importó cuál era el horario posteado. Se le preguntó por los resultados negativos de venta y simplemente se limitó a decir que los clientes no estaban comprando. Sin embargo, desconocía cuáles clientes estaban comprando menos, las razones, etcétera. Esta información está disponible en reportes a los cuales el señor Vega tiene acceso. El señor Vega tampoco había contactado ni hablado con sus clientes para entender la causa de la reducción [en] ventas y buscar alguna solución al respecto."

"Al preguntársele al señor Vega desde cuándo no accedía los reportes de venta, herramienta importante para lograr los objetivos de la empresa, este indicó que hacía por lo menos un mes que no entraba a los mismos. Esto se supone ocurra diariamente. Al preguntarle la razón por la cual no había entrado, indicó que se le olvidó el código y no había hecho gestión alguna para lograr acceso al mismo."

"Se le preguntó también al señor Vega sobre el proceso de llamadas diarias a los clientes, una herramienta para fomentar e incrementar las ventas. Este no tuvo contestación alguna. Sencillamente no estaba llevando a cabo el procedimiento, el cual tiene el propósito de incrementar las ventas y tener conversaciones con clientes, lo cual le puede ayudar a entender el por qué los clientes alegadamente no están comprando."

"Estas son muestras de la dejadez y falta de intención y compromiso con su trabajo y departamento comercial. La actitud del señor Vega demuestra que no está engranando con su trabajo, equipo y clientes, ni tiene el deseo ni intención de mejorar."
[…]

"El señor Vega tiene un patrón de pobre desempeño, no seguir los procesos y falta de interés. Este consistentemente ha mostrado un trabajo deficiente, ventas negativas, falta de interés en seguir los procedimientos y no cumple con las expectativas de la empresa."
"A pesar de la asesoría y advertencias previas, el señor Vega no ha mostrado ningún interés de mejorar o cumplir con las expectativas de la empresa. Por el contrario, su actitud es una desinteresada y de dejadez."

"Debido a las razones antes expuestos, se está terminando con el empleo del señor Vega."

69. Aparte del contenido del "Formulario de Acción Disciplinaria" del 8 de noviembre de 2019, el querellante admitió no recordar que se haya discutido nada más en la reunión de despido.

70. Vega admitió que desconoce quién o quiénes tomaron la determinación de despedirlo. Admitió, además, que no conoce cuándo se tomó la determinación de despedirlo.

71. El querellante no pidió reconsideración de la decisión de despedirlo.

72. Vega admitió que el Sr. Héctor López, quien era su supervisor inmediato a la fecha de su despido, es mayor que él. López estuvo presente en la reunión en que se le notificó el despido al querellante.

73. Vega sostiene su reclamación de discrimen por edad en que llevaba 23 años trabajando para Pep Boys, y que tenía 59 años al momento del despido.

74. Vega admitió que, fuera de su alegación de que recibió una serie de acciones disciplinarias y luego lo despidieron, no tiene ninguna otra razón o hecho específico en el cual sostenga su reclamación de despido discriminatorio.

75. Vega admitió que sostiene su reclamación de alegado despido injustificado en los mismos hechos que basa su reclamación de discrimen por edad.

Como cuestión de derecho, el foro primario concluyó que procedía la desestimación de la reclamación de despido injustificado y alegado discrimen por razón de edad presentadas por el señor Vega, según solicitó Pep Boys, toda vez que medió justa causa para su despido. Destacó el foro primario que, surge de los hechos incontrovertidos sustentados por la prueba documental, que el apelante "fue amonestado en al menos diez (10) ocasiones y fue receptor de evaluaciones de desempeño desfavorables[10] por, entre otros, (i) incumplir consistentemente con los requisitos mínimos de su puesto; (ii) no seguir los procedimientos operativos de Pep Boys y;

---
[10] Refiérase a Determinaciones de Hechos 24-29.

(iii) mostrar una clara falta de interés en su trabajo, lo que incluye, pero no se limita a: pobre calidad de trabajo, ausentismo excesivo, incumplimiento con los requisitos mínimos de ventas, entre otras violaciones a las normas, políticas y procedimientos razonables de la Compañía, sobre los cuales este tenía pleno conocimiento". Enfatizó el TPI, que para el 9 de marzo de 2019, el señor Vega Jiménez fue nuevamente receptor de un "*Notice of Performance Counseling*" y que a pesar de la advertencia recibida el 9 de marzo de 2019, el apelante no mejoró su desempeño y recibió múltiples amonestaciones posteriores. Así, por ejemplo, puntualizó el TPI que el 19 de junio de 2019, el señor Vega Jiménez fue nuevamente amonestado por incumplimiento con los procedimientos de la empresa y que "volvió a ser amonestado nuevamente para el 29 de septiembre de 2019, **la cual se describió como una consejería escrita final,** por no mantener al día las gestiones de seguimiento con los clientes VIPs, y porque sus ventas se encontraban en números negativos". Finalmente, concluyó el foro primario que el **despido del apelante debido a sus problemas de desempeño estuvo plenamente justificado, y que este no estableció un caso prima facie de discrimen por razón de su edad.** Razonó el TPI que, aun si el apelante hubiese logrado demostrar algunos de los elementos de un *caso prima facie* de discrimen, éste no contaba con suficiente evidencia admisible para probar el cuarto requisito, toda vez que **no fue reemplazado** por alguien más joven.[11]

Inconforme, el señor Vega Jiménez presentó el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

A.  ERRÓ EL TPI AL DENEGAR LA PRODUCCIÓN DE DOCUMENTOS DE LOS EXPEDIENTES DE PERSONAL DE LOS EMPLEADOS JÓVENES.

B.  ERRÓ EL TPI AL DENEGAR LA SOLICITUD DE ORDEN PARA SEÑALAR UNA VISTA DE INSPECCIÓN PARA EVALUAR LOS EXPEDIENTES DE PERSONAL DE LOS EMPLEADOS JÓVENES.

C.  ERRÓ EL TPI AL DENEGAR LA SOLICITUD DE PARALIZACIÓN DE LA SENTENCIA SUMARIA BAJO LA REGLA 36.6 PARA PERMITIR DESCUBRIMIENTO DE

---

[11] Véase *Díaz Fontánez v. Wyndham Hotel*, supra, en la pág. 383 n. 32.

PRUEBA ADICIONAL SOBRE LOS EXPEDIENTES DE PERSONAL DE LOS EMPLEADOS JÓVENES.

Por su parte, Pep Boys compareció mediante *Alegato en Oposición a Recurso de Apelación.* En síntesis, Pep Boys sostiene que surge de los hechos materiales incontrovertidos, que el despido del apelante estuvo justificado en su pobre desempeño y múltiples violaciones a las normas y políticas de la compañía, sin que mediaran razones discriminatorias.

II

A.

El mecanismo procesal de la sentencia sumaria surge de la Regla 36.1 de Procedimiento Civil, *supra*, R. 36.1. El propósito de esta regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales que no requieren ventilarse en un juicio plenario. *Rodríguez García v. UCA*, 200 DPR 929 (2018); *Bobé et al. v. UBS Financial Service*, 198 DPR 6, 20 (2017); *SLG Zapata-Rivera v. JF Montalvo*, 189 DPR 414, 430 (2013).

La Regla 36.2, *supra*, R. 36.2 dispone que la parte promovente deberá establecer, con prueba admisible en evidencia, que no existe controversia real respecto a los hechos materiales del pleito. Además, según la Regla 36.3, *supra*, tendrá que desglosar, en párrafos numerados, los hechos respecto a los cuales aduce que no existe disputa, así como especificar la página o párrafo del documento que sirva de apoyo a su alegación.[12]

---

[12] En cuanto al contenido de una moción de sentencia sumaria, dicha Regla 36.3, *supra*, R.36.3 (a) dispone que:
    (a) La moción de sentencia sumaria se notificará a la parte contraria y contendrá lo siguiente:
    (1) una exposición breve de las alegaciones de las partes;
    (2) los asuntos litigiosos o en controversia;
    (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;
    (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
    (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y
    (6) el remedio que debe ser concedido.

De otro lado, el promovido por una solicitud de sentencia sumaria tiene el deber de controvertir la prueba presentada por la parte promovente de la moción. Este no puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa. Regla 36.3 (c), *supra,* R. 36.3; *SLG Zapata Berríos v. JF Montalvo*, supra, a la pág. 434; *Ramos Pérez v. Univisión*, 178 DPR 200, 215 (2010); *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550-551 (2007).

En otras palabras, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que están en disputa". *León Torres v. Rivera Lebrón*, 204 DPR 20, 44 (2020). Por lo que, se requiere que la oposición a la moción de sentencia sumaria contenga:

> [U]na relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal. Regla 36.3 (b) (2), *supra*, R. 36. (b) (2).

Si la parte promovida no cumple con los requisitos impuestos por la mencionada regla, el tribunal podría resolver en su contra de entenderlo procedente. Regla 36.3 (c) de Procedimiento Civil, *supra*, R. 36.3 (c). Véase, además, *Cruz Marcano v. Sánchez Tarazona*, *supra*; *SLG Zapata Berríos v. JF Montalvo*, *supra*, y *Ramos Pérez v. Univisión*, *supra*.

La moción de sentencia sumaria debe resolverse conforme al derecho sustantivo aplicable, y si de las propias alegaciones, admisiones o declaraciones juradas surge alguna controversia, no procede disponer del asunto sumariamente. *Ortiz v. Holsum*, 190 DPR 511, 525 (2014). En este sentido, al evaluar los documentos presentados por las partes, el tribunal deberá utilizar el principio de liberalidad a favor del opositor de la moción. *Ramos Pérez v. Univisión*, *supra*, págs. 216-217.

En *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015), el Tribunal Supremo de Puerto Rico estableció el estándar que el Tribunal de Apelaciones debe utilizar para revisar una denegatoria o concesión de una moción de sentencia sumaria. Dictaminó que: "[e]l Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar solicitudes de Sentencia Sumaria". Íd., a la pág. 115. La revisión que realice el foro apelativo deberá ser *de novo* y estará limitado a solamente adjudicar los documentos presentados en el foro apelado. *Vera v. Dr. Bravo*, 161 DPR 308, 334-335. Todas las inferencias permitidas deberán ser a favor de la parte oponente a la moción de sentencia sumaria, de forma que se evalúe el expediente de la manera más favorable hacia dicha parte. *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 118. Además, deberá constatar que las partes cumplan con los requisitos de forma que dicta la Regla 36, *supra*, tanto en la moción de sentencia sumaria, como en la oposición, y deberá revisar si existen hechos materiales en controversia. Íd. Si existiesen, el foro apelativo tendrá que exponer los hechos que se encontraron en controversia y los que no, conforme a la Regla 36.4, *supra*, R. 36.4. Si el foro apelativo no encuentra hechos controvertidos, deberá revisar *de novo* si el foro inferior aplicó correctamente el derecho. Íd., pág. 119.

B.

En lo pertinente la Ley 2-1961, *supra,* tiene como propósito principal proveerle al obrero un mecanismo procesal expedito que facilite y acelere el trámite de sus reclamaciones laborales. *Rivera v. Insular Wire Products Corp.*, 140 DPR 912, 928 (1996). El procedimiento sumario "es el recurso principal 'para la implantación de la política pública del Estado de proteger el empleo, desalentando el despido sin justa causa y proveyendo al obrero así despedido los medios económicos para la subsistencia de éste y de su familia, en la etapa de transición entre empleos'". *Medina Nazario v. McNeil Healthcare LLC*, 194 DR 723, 732 (2016) (citando a *Rivera v. Insular Wire Products*, supra, pág. 923). Véase, además, *Izagas Santos v. Family Drug*

*Center*, 182 DPR 463, 480 (2011). La citada ley establece un procedimiento sumario, en el cual, entre otras cosas, los términos son más cortos, el uso de mecanismos descubrimiento de prueba es limitado, la aplicabilidad de las Reglas de Procedimiento Civil esta ceñida a los criterios esbozados en esta y los mecanismos para la revisión y ejecución de las sentencias se ejercerá de acuerdo con lo especificado en dicha ley. Ello tiene el propósito de adelantar los fines de la Ley 2-1961, supra, y tomar en cuenta la disparidad económica entre las partes.

En particular **en cuanto al descubrimiento de prueba**, para este procedimiento de carácter sumario la Ley 2-1961 dispone lo siguiente:

> Disponiéndose, en relación con los medios de descubrimiento anteriores al juicio autorizados por las Reglas de Procedimiento Civil, que la parte querellada no podrá usarlos para obtener información que debe figurar en las constancias, nóminas, listas de jornales y demás récords que los patronos vienen obligados a conservar . ...
> y que **ninguna de las partes podrá someter más de un interrogatorio o deposición ni podrá tomar una deposición a la otra parte después que le haya sometido un interrogatorio, ni someterle un interrogatorio después que le haya tomado una deposición, excepto que medien circunstancias excepcionales que a juicio del tribunal justifiquen la concesión de otro interrogatorio u otra deposición**. No se permitirá la toma de deposición a los testigos sin la autorización del tribunal, previa determinación de la necesidad de utilizar dicho procedimiento.

32 LPRA sec. 3120 (énfasis suplido).

C.

El derecho a adquirir y renunciar libremente al trabajo está cobijado por la Constitución de Puerto Rico. Art. II, Secs. 1, 16, y 8, Const. ELA, LPRA, Tomo 1. Cónsono con ello, la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, conocida como "Ley Sobre Despidos Injustificados"[13], permite a los empleados despedidos sin justa causa reclamar a su patrono una indemnización.[14] El propósito de esta ley no es prohibir que un patrono despida a un empleado, sino proteger al obrero puertorriqueño al garantizarles su derecho a recibir de su patrono una compensación e indemnización cuando sean despedidos **<u>sin justa causa</u>.** *Exposición de*

---

[13] Ley Núm. 80, *supra*, sec. 185a.
[14] La Ley Núm. 80 fue enmendada por la Ley Núm. 4-2017, "Ley de Transformación y Flexibilidad Laboral".

*Motivos* de la Ley Núm. 80, *supra*. Véase, además, *Segarra Rivera v. International Shipping Agency, Inc.; Intership Tote, Inc./ Tote Maritime Puerto Rico, LLC y otros,* supra

El Art. 5 de la Ley Núm. 80, *supra*,[15] reconoce tres modalidades de despido: (1) la cesantía del empleado, (2) la suspensión indefinida o por un término que exceda de tres (3) meses, y (3) la renuncia del empleado motivada por actuaciones del patrono que induzcan o lo obliguen a renunciar.

De otro lado, la justa causa para el despido se rige por el Art. 2 de la Ley Núm. 80, *supra*.[16] Dicho artículo contiene una lista no taxativa de causas justificadas para el despido. *González Santiago v. Baxter Healthcare*, 202 DPR 281, 292 (2019). Según el Art. 2, *supra*, "se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento". Art. 2 de la Ley Núm. 80, *supra*. Entre algunas de estas razones, se encuentran las siguientes:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
(d) […]
(e) […]
(f) […][17]

Ahora bien, si la alegada justa causa no está contenida en esta lista, el análisis del tribunal se basará en el principio rector establecido en el Art. 2 de la Ley Núm. 80, *supra*. *González Santiago v. Baxter Healthcare*, supra, pág. 292; *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 931 (2015). El mismo dispone que la justa causa no puede ser originada

---

[15] 29 LPRA sec. 185e.
[16] 29 LPRA sec. 185b.
[17] Íd.

por razones legalmente prohibidas o producto del mero capricho de un patrono. Íd.

Por otra parte, "un patrono puede adoptar los reglamentos y las normas razonables que estime necesarias para el buen funcionamiento de la empresa y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción". *González Santiago v. Baxter Healthcare*, supra, pág. 292; *Jusino et als. v. Walgreens*, 155 DPR 560, 573 (2001). En esa línea, nuestro Tribunal Supremo ha reconocido que: "el despido como sanción por la primera falta podría considerarse justificado". *González Santiago v. Baxter Healthcare*, supra, pág. 292; *Srio. del Trabajo v. I.T.T.*, 108 DPR 536, 542 (1979). Ello, en circunstancias en las que el acto o la falta que ha dado lugar al despido "es de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa". *González Santiago v. Baxter Healthcare*, supra, págs. 292-293 citando a *Feliciano Martes v. Sheraton*, 182 DPR 368, 383 (2011). Véase, además, *Srio. del Trabajo v. I.T.T.*, supra, pág. 544. Cónsono con ello, el acto o la falta, por su gravedad y posible agravio, tiene que colocar en riesgo la seguridad, el orden o la eficiencia del funcionamiento de la empresa. *González Santiago v. Baxter Healthcare*, supra. Como consecuencia, en instancias como las descritas, sería una imprudencia esperar a que ocurra otra falta o acto para despedir al empleado. Íd.; *Rivera v. Pan Pepín*, 161 DPR 681, 690 (2004); *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 DPR 643, 650 (1994); *Srio. del Trabajo v. I.T.T.*, supra, pág. 544.

D.

En Puerto Rico existe una clara política pública, de origen tanto constitucional como estatutario, que prohíbe el discrimen. *Santini Rivera v. Serv. Air, Inc.*, 137 DPR 1, 13 (1994). En virtud de la Constitución de Puerto Rico, la Asamblea Legislativa aprobó la Ley Núm. 100 de 30 de junio de 1959, mejor conocida como "Ley Contra el Discrimen en el Empleo" (Ley Núm. 100), la cual recoge dicha política pública, para la protección de los

trabajadores puertorriqueños. *Segarra Rivera v. International Shipping Agency, Inc.; Intership Tote, Inc./ Tote Maritime Puerto Rico, LLC y otros*, supra. La citada Ley prohíbe el discrimen en el empleo por distintas razones, entre ellas, por edad. [18] Véase el Art. 1 de la Ley Núm. 100.[19] El estatuto impone al patrono responsabilidad civil y penal por incurrir en conducta discriminatoria proscrita. El patrono estará entonces obligado a establecer que el despido no fue motivado por razones discriminatorias.

El Art. 3 de la Ley Núm. 100 establecía una presunción de discrimen a favor del obrero cesanteado sin justa causa.[20] No obstante, el Art. 6.3 de la Ley Núm. 4-2017 enmendó el citado artículo para expresamente eliminar dicha presunción. Por lo tanto, le corresponde al empleado establecer, mediante preponderancia de evidencia, que fue despedido por las razones proscritas por la Ley Núm. 100, *supra*.

III

Es la contención del apelante que incidió el foro primario al denegar su solicitud de producción de documentos de los expedientes de personal de los empleados jóvenes; al denegar su solicitud de orden para señalar una vista para evaluar dichos expedientes de personal y al denegar su solicitud de paralización de la sentencia sumaria para permitir descubrimiento de prueba adicional sobre los expedientes de personal de los empleados más jóvenes.

Como cuestión de umbral, es preciso destacar que el señor Vega Jiménez activó el sistema judicial bajo el procedimiento sumario de la Ley 2-1961, que provee para que las reclamaciones laborales se tramiten de manera expedita. *Rivera v. Insular Wire Products Corp.*, supra. Asimismo, puntualizamos que **la Ley 2-1961 limita el descubrimiento de prueba a cursarse en estos procedimientos**. Según expusimos: "ninguna de las partes podrá someter más de un interrogatorio o deposición ni podrá tomar

---

[18] 29 LPRA secs. 146 *et seq.*
[19] 29 LPRA sec. 146.
[20] El Artículo 3 de la Ley Núm. 100 disponía que: "Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizados sin justa causa. Esta presunción será de carácter controvertible". 29 LPRA ant. sec. 148.

una deposición a la otra parte después que le haya sometido un interrogatorio". 32 LPRA sec. 3120. **En el caso que nos ocupa, ya las partes habían completado el descubrimiento de prueba calendarizado para culminar el 31 de agosto de 2021, conforme a las limitaciones de la Ley 2-1961,** supra, **y luego de que el foro primario autorizara al apelante a descubrir prueba adicional.[21]** El caso ya estaba listo para la conferencia con antelación a juicio, cuando Pep Boys presentó la *Solicitud de Sentencia Sumaria*. Fue **luego de la concesión de tres prórrogas para oponerse a la** *Solicitud de Sentencia Sumaria***, concedidas por el foro primario al apelante, que el señor Vega Jiménez solicitó al TPI que autorizara otro descubrimiento adicional**. El señor Vega Jiménez no compareció dentro del término concedido, pese a las múltiples oportunidades que tuvo, por lo que **no incidió** el foro primario al dar por sometida la solicitud de sentencia sumaria de Pep Boys sin oposición del apelante, y al denegar su solicitud para descubrir prueba adicional en el procedimiento sumario que provee la ley Núm. 2, *supra*.

**Sobre esos extremos concluimos, que no incidió el foro primario al denegar la solicitud del apelante para descubrir prueba adicional. Reiteramos que el TPI, en su *Resolución* de 27 de mayo de 2021, ya había autorizado el descubrimiento de prueba adicional solicitado por el señor Vega Jiménez aún cuando el caso de epígrafe es uno sumario.**

Tras un examen de *la Solicitud de Sentencia Sumaria* presentada por Pep Boys ante el TPI, **sin oposición del apelante,** la prueba documental anejada a dicha solicitud y de la sentencia apelada, resolvemos que **no existe controversia sobre los hechos determinados por el foro primario en el dictamen apelado por el señor Vega Jiménez.** Es preciso destacar, que aún la parte que se opone a una moción de sentencia sumaria no puede descansar en aseveraciones o negaciones contenidas en sus alegaciones, ni en conclusiones que surgen en las alegaciones de

---

[21] Véase Resolución de 27 de mayo de 2021.

su demanda para controvertir los hechos mencionados en la moción. *Véase,* Regla 36.3 (c) de Procedimiento Civil, supra. Por lo cual, hacemos formar parte de la presente Sentencia, las Determinaciones de Hechos del foro primario.

Surge de estos hechos incontrovertidos, sustentados por la prueba documental que obra en el expediente, que el **despido del apelante obedeció a sus evaluaciones de desempeño y a sus violaciones a las normas de la compañía,** por lo que este **estuvo plenamente justificado** y no constituyó un pretexto para discriminar en su contra por razón de su edad**. El señor Vega Jiménez tampoco estableció un caso prima facie de discrimen por razón de su edad.**

Aún si el apelante hubiese logrado demostrar algunos de los elementos de un *caso prima facie* de discrimen, lo que no ocurrió, éste no contaba con suficiente prueba admisible para probarlo toda vez que no fue reemplazado por alguien más joven.

En el caso que nos ocupa, Pep Boys articuló y probó con prueba documental incontrovertida, **una razón legítima no discriminatoria para el despido del señor Vega Jiménez**, por lo que la parte apelada demostró la existencia de justa causa para el despido del apelante y este no demostró la existencia de actos constitutivos de discrimen por edad por parte del patrono.

En vista de ello, no incidió el foro primario al concluir que los actos del apelante constituyeron justa causa para su despido y que procedía dictar sentencia sumaria y ordenar la desestimación de la Querella.

IV

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, confirmamos la Sentencia apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones